Junior S. JACKSON, Plaintiff-Appellee,
Cross-Appellant,

v.

CONSOLIDATED RAIL CORPORATION,
Defendant-Appellant, Cross-Appellee.

Nos. 82–2362, 82–2363.

United States Court of Appeals,
Seventh Circuit.

Argued April 15, 1983.

Decided Sept. 1, 1983.

Certiorari Denied Jan. 23, 1984.
See 104 S.Ct. 1000.

Alvin E. Domash, Lord Bissell & Brook, Chicago, Ill., for defendant-appellant, cross-appellee.

Lawrence W. Leck, Lawrence Leck & Assoc., Ltd., Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before PELL and POSNER, Circuit Judges, and BROWN, Senior Circuit Judge.*

PELL, Circuit Judge.

Consolidated Rail Corporation (Conrail) appeals from judgments entered below, pursuant to jury verdicts, awarding Junior S. Jackson (Jackson) compensatory damages

---

* Bailey Brown, Senior Circuit Judge for the    Sixth Circuit, sitting by designation.

in the amount of $13,500 for his claim under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (FELA), and $182,000 pursuant to his pendent claim of retaliatory discharge. Jackson urges on cross-appeal that a punitive damage award of $1,260,000, relating to the retaliatory discharge claim, should be reinstated.

The principal issue on appeal is whether the provisions of the Railway Labor Act (RLA) providing for a scheme of administrative grievance procedures and remedies, 45 U.S.C. § 153 First, preempt the state tort action for retaliatory discharge upon which Jackson relied. If the RLA does preempt the state action, a related issue is whether the preemptive effect is to divest the district court of subject matter jurisdiction over Jackson's pendent claim, thereby making immaterial Conrail's delay until after trial in raising the preemption defense.

## I. FACTS

Jackson worked as a track maintenance foreman for Conrail. He was a member of the Brotherhood of Maintenance of Railway Employees (Union) and covered by the Union's collective bargaining agreement.

On August 22, 1980, Jackson filed a two-count complaint against his employer pursuant to the FELA. Jackson alleged that he suffered work-related injuries on or about February 3, 1978 and, as a result, was hospitalized for approximately ten days that month.[1]

On February 3, 1981, Jackson received a letter from Conrail. The letter advised him that a formal hearing would be held to determine whether he had violated the Railroad Safety Rules by, *inter alia,* failing to report his alleged injury of February 3, 1978. The hearing was held on February 25, 1981. A transcript of the hearing was sent to the Division Engineer so that he could determine what discipline was to be administered. Hammons, the Division Engineer, had learned previously of Jackson's 1978 injury because he had received a copy of Jackson's FELA complaint in November, 1980.[2] On April 20, 1981, Hammons issued a notice of discipline, discharging Jackson for failing to report immediately his February 3, 1978 injury to a supervisor as required by Railroad Safety Rule 3000(a) and for lifting beyond his physical capabilities.[3]

On April 10, 1981, Jackson had amended his claim to add a third count. He charged Conrail with job harassment and the intentional infliction of emotional distress.[4] Following his discharge, Jackson indicated that he would again amend his complaint to state a claim of retaliatory discharge and filed an emergency motion seeking to enjoin Conrail from discharging him in retaliation for filing the FELA claim. A hearing was held before Judge Marvin E. Aspen on May 4, 1981. Judge Aspen denied injunctive relief, noting that both Indiana and Illinois recognize a cause of action for retaliatory discharge and that Jackson could be adequately compensated if he succeeded in such an action.

On May 7, 1981, Jackson amended his complaint to add a fourth count alleging retaliatory discharge. He sought $250,000 compensatory damages and $500,000 puni-

---

1. Despite the parties' extensive briefing as to the nature of Jackson's claimed injuries, these facts are irrelevant to this appeal because Conrail has not challenged the jury verdict on the FELA action as being against the weight of the evidence. We therefore decline to recite the facts regarding these injuries.

2. The copy of the complaint received by Hammons was accompanied by a letter from a Conrail claims agent suggesting that disciplinary action be instituted against Jackson.

3. Conrail argues on appeal that Jackson was not "discharged" because he was entitled to a three-level appeal after Hammons' serving of the initial discharge notice on April 20, 1981.

Jackson did not avail himself of this appeal process. In view of our disposition of the issues presented by this appeal, whether Jackson's discharge was final on April 20, 1981, is of no legal significance. We therefore will utilize the term "discharge" to describe the employment action taken against Jackson on that date.

4. This claim was withdrawn on April 27, 1982, when Jackson filed a Third Amended Complaint to conform to the proof adduced at trial. The Third Amended Complaint also increased the requested punitive damages to $5,000,000.

tive damages. He asserted that the court had pendent jurisdiction over the claim. Conrail did not challenge this jurisdictional basis.

On April 19, 1982, a jury trial commenced before Senior Judge J. Sam Perry. On April 27, 1982, the jury returned its verdicts awarding the plaintiff $13,500 in compensatory damages on the FELA claim, $182,000 compensatory damages on the retaliatory discharge claim, and $1,260,000 punitive damages on that action. Conrail subsequently filed its post-trial motions urging, inter alia, that the district court lacked subject matter jurisdiction over Jackson's retaliatory discharge claim and that a new trial should be granted because of inflammatory remarks by Jackson's counsel during opening and closing argument. Prior to filing this motion, Conrail had not objected to the district court's exercise of pendent jurisdiction over the retaliatory discharge claim.

On July 28, 1982, the district court issued a memorandum order denying all Conrail's post-trial motions. The court upheld the jury verdicts except for the $1,260,000 punitive damage award which was set aside on the ground that willful, malicious, or oppressive conduct could only be asserted against Jackson's superior, who was not a party to the action, rather than against Conrail.

Conrail has appealed on the grounds that the district court lacked subject matter jurisdiction over the retaliatory discharge claim and that a new trial is required to determine the amount of compensatory damages because both compensatory awards were tainted by evidence and argument relevant, if at all, only to the question of punitive damages. Jackson urges on cross-appeal that the punitive damage award should be reinstated.

## II. SUBJECT MATTER JURISDICTION

Conrail contends that the scheme of administrative remedies and procedures mandated by 45 U.S.C. § 153 First preempts the power of the district court to entertain, pursuant to pendent jurisdiction, Jackson's claim of retaliatory discharge. Conrail's argument turns on three analytically distinct points: (1) Jackson's claim is a variety of wrongful discharge action and, under *Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972) (*Andrews*), his exclusive remedy lay with the grievance procedures established pursuant to the collective bargaining agreement and with the National Railroad Adjustment Board (NRAB) created by 45 U.S.C. § 153 First;[5] (2) the preemption effected by the RLA divests the district court of subject matter jurisdiction over Jackson's pendent claim; and (3) because the court below lacked subject matter jurisdiction, Conrail cannot be estopped from raising the issue for the first time in its post-trial motions. Although there is some congruence in the discussion necessitated by the three prongs of Conrail's argument, we shall discuss each in turn insofar as possible.

### A. Preemptive Effect of the RLA

*Andrews,* upon which Conrail relies, involved a railroad employee who was unable to work for a period after he was involved in an automobile accident. When Andrews believed that he was physically able to return to work, the railroad refused to allow him to return. Andrews severed his connection with the railroad, characterized its refusal to grant him work as a wrongful discharge, and sought relief, in the form of

---

**5.** The portion of 45 U.S.C. § 153 First particularly relevant to both *Andrews* and the present case provides:

   The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, ... shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the [NRAB] with a full statement of the facts and all supporting data bearing upon the disputes.

45 U.S.C. § 153 First (i).

damages for loss of past and future earnings, in the Georgia state court. After the railroad removed the case to federal court, both the district court and court of appeals held that Andrews' tort claim was barred because he had failed to exhaust his administrative remedies under the RLA.

The Supreme Court affirmed the dismissal of Andrews' suit. Two aspects of the *Andrews* opinion are particularly relevant to the present case. First, the Court reasoned that Andrews' claim was a minor dispute, subject to the arbitration remedy provided under the RLA, 45 U.S.C. § 153 First (i), because the collective bargaining agreement was necessarily the source of Andrews' claim that the discharge was wrongful. The Court noted that, absent the bargaining agreement, Andrews would have been subject to termination at the will of the railroad. 406 U.S. at 324, 92 S.Ct. at 1565. Second, the Court emphasized that exhaustion under the RLA does not mean merely that one must utilize administrative remedies before relitigating the merits of one's claim in an independent judicial proceeding. Rather, under the RLA, the federal administrative remedy is exclusive. *Id.* at 325, 92 S.Ct. at 1565.

■ Jackson urges on appeal that the district judge correctly found his claim to be outside the scope of *Andrews* and therefore cognizable as a pendent claim in his FELA suit. There is no question that Jackson's right not to be discharged at the will of Conrail grows out of the collective bargaining agreement. Similarly, there is no doubt that a "retaliatory discharge" is one variety of a "wrongful discharge" claim. Jackson's argument is that retaliatory discharge implicates certain rights that distinguish it sufficiently from the discharge in *Andrews* to place Jackson's claim outside the scope of the *Andrews* holding. Whether this is true is a question of first impression. The arguments and case law upon

which Jackson relies are best grouped into two lines of analysis: (1) that his retaliatory discharge claim vindicates a federal FELA right, and (2) that an exception to preemption is justified in this case by *Farmer v. United Brotherhood of Carpenters, Local 24,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). We discuss each in turn.[6]

### 1. Vindication of Federal Right.

■ Jackson analogizes this case to those in which a claim based on a federal statute has been upheld, despite petitioner's failure to exhaust administrative remedies under the RLA or to obtain relief pursuant to those remedies. *E.g., Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Johnson v. American Airlines, Inc.,* 487 F.Supp. 1343 (N.D.Tex.1980). Jackson reasons that he had a federal statutory right to bring an FELA suit, 45 U.S.C. § 51, and that suffering discharge in retaliation for bringing such a suit has an impermissible impact on his federal right.

In *Johnson v. American Airlines, Inc.,* 487 F.Supp. 1343 (N.D.Tex.1980), former commercial airline pilots challenged American's rule that made retirement of pilots mandatory at age sixty. The former pilots wanted to continue working for American as flight engineers. Flight engineers were not subject to the age sixty retirement rule. The district court held that the pilots' suit, based on the Age Discrimination in Employment Act, 29 U.S.C. § 623 (ADEA), was cognizable even though the plaintiffs had not exhausted the applicable remedies under the collective bargaining agreement or the RLA. The court relied on the holding in *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 45, 94 S.Ct. 1011, 1018, 39 L.Ed.2d 147 (1974), in which the Court stated that an arbitrator's resolution of a contractual

---

6. A third argument raised by Jackson requires only cursory consideration. Jackson contends that application of the *Andrews* preemption doctrine to the instant case would violate his Seventh Amendment right to a jury trial. This argument is not persuasive. In *Essary v. Chi-* *cago & Northwestern Transp. Co.,* 618 F.2d 13, 17 (7th Cir.1980), this court held that the procedures established under the RLA are "a reasonable substitution for a jury trial" and would not "be deemed to violate plaintiff's Seventh Amendment rights."

claim is not necessarily dispositive of a statutory claim premised on Title VII. *Johnson,* 487 F.Supp. at 1345. The *Johnson* court noted that exhaustion of administrative remedies was not a condition precedent to maintaining an ADEA suit because the right not to suffer from age discrimination is a federal statutory right rather than a contractual right. *Id.* at 1346. *See also Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (wage claims based on Fair Labor Standards Act, 29 U.S.C. §§ 201–219, not barred by prior submission of grievances to contractual dispute resolution procedures); *Conrad v. Delta Airlines, Inc.,* 494 F.2d 914 (7th Cir.1974) (distinguishing *Andrews* from Conrad's allegations that Delta discharged him, in violation of the express provisions of 45 U.S.C. § 152 Fourth, because of his union activities).

The present case is distinguishable from *Barrentine, Conrad,* and *Johnson* because neither the FELA, the RLA, nor any other federal statute specifically provides a right of action to one discharged under the circumstances alleged by Jackson. The question is whether the state tort action for retaliatory discharge, buttressed by the policies underlying the FELA, is sufficiently analogous to a federal statutory right to rebut the preemption of the RLA.

The case most relevant to resolving this issue is *Hendley v. Central of Georgia Railroad,* 609 F.2d 1146 (5th Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981). Hendley brought suit to enjoin the railroad for which he worked from conducting a disciplinary hearing relating to his alleged disloyalty in assisting a fellow employee's FELA action against the railroad. Hendley relied on 45 U.S.C. § 60 which provides that it is a crime to discipline an employee for voluntarily furnishing information in connection with an FELA case. The district court in *Hendley* had ruled that his claim was a minor dispute, within the exclusive jurisdiction of the NRAB, because the FELA case was already concluded and there was no possibility that relevant evidence would be suppressed through coercion by the railroad.

Several factors were relevant to the Fifth Circuit's holding that Hendley's claim was cognizable in federal court. The court noted that the case involved interpretation of a federal statute because it was necessary to determine whether 45 U.S.C. § 60 was applicable after the FELA action was concluded. The Fifth Circuit also analogized *Hendley* to *Brotherhood of Railroad Trainmen v. Central of Georgia Railway,* 305 F.2d 605 (5th Cir.1962) (*Brotherhood*), in which the plaintiff had alleged that a disloyalty investigation by the railroad was instituted in order to discredit the union of which he was a representative. Because these allegations constituted, if proven, a violation of 45 U.S.C. § 152 Third, which prohibits coercion in the employees' choice of a representative, the Fifth Circuit had held that it had jurisdiction over the case. The *Hendley* court explicitly distinguished *Brotherhood* from a later Fifth Circuit disposition, *Brotherhood of Railroad Trainmen v. Southern Railway,* 393 F.2d 303 (5th Cir. 1968) (*Southern*), in which the plaintiff had relied on the general policy provisions of the RLA. The *Southern* court had held that jurisdiction could not be premised on such a general policy statement. *Hendley,* 609 F.2d at 1152 n. 4.

The *Hendley* decision therefore recognizes an exception to preemption only if the suit is premised on a specific federal statutory section. It distinguishes such a claim from one in which the allegations constitute, if proven, only a violation of the policy underlying a federal statute. This distinction, recognized in *Hendley,* strongly suggests that the statutory procedures and remedies of the RLA are *not* rebutted in Jackson's case.

There is admittedly a superficial appeal to reasoning that the FELA, particularly those sections stating the right to sue, 45 U.S.C. § 51, and the prohibition against coercing an employee not to volunteer information relative to a fellow employee's FELA action, *id.* § 60, prohibits an employer from discharging an employee in retaliation for filing an FELA action. Such a

statute has not, however, been enacted by Congress.

In a case like this involving a railway worker subject to the RLA, yet entitled to rely upon the FELA, there is a tension between the two federal statutes. In such a context, a court must be particularly reluctant to elevate an FELA policy to the status of a federal right. Such caution is illustrated by *Bay v. Western Pacific Railroad,* 595 F.2d 514 (9th Cir.1979), in which the court held that the language of 45 U.S.C. § 55, which, *inter alia,* declares "void" any "device" utilized by a common carrier to exempt itself from FELA liability, provides no private cause of action for an employee allegedly discharged in retaliation for filing an FELA action. That Jackson's claim is separately grounded in a state cause of action is immaterial because it is only federal statutory rights that have been held, under cases such as *Barrentine, Hendley, Conrad,* and *Johnson,* to rebut the preemption of the RLA. *See De La Rosa Sanchez v. Eastern Airlines, Inc.,* 574 F.2d 29 (1st Cir.1978) (holding pension claim based on law of Puerto Rico subject to exclusive jurisdiction of the RLA despite alleged federal interest, embodied in the Employee Retirement Income Security Act of 1974, in fulfillment of pension obligations). We therefore concur with the distinction recognized by the *Hendley* court between cases premised on a federal statutory provision and those premised on a federal policy and hold that the policies underlying the FELA do not overcome the RLA mandate that Jackson's exclusive remedy lay with administrative grievance procedures.[7]

### 2. *Farmer* Exception to Preemption.

The second argument urged by Jackson is that the "outrageous" conduct of Conrail

requires recognition of an exception to the preemption doctrine in this case as it did in cases such as *Farmer v. Brotherhood of Carpenters, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (*Farmer*); and *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) (*Sears*). In both *Farmer* and *Sears,* the Supreme Court held that state claims were cognizable because they were not preempted by the federal labor laws.

In *Farmer,* the Court held that a California state court could exercise jurisdiction over the claim of a local union officer alleging intentional infliction of emotional distress. Hill, the petitioner's decedent, had alleged that, as a result of disagreement with other union officials, he was subjected to a campaign of ridicule and personal abuse and was discriminated against by the union hiring hall. After reviewing exceptions to the preemption doctrine recognized in earlier cases, *Farmer,* 430 U.S. at 295–97, 97 S.Ct. at 1060–61, the Court stated that one must determine the scope of the general preemption rule "by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." *Id.* at 297, 97 S.Ct. at 1061.

In applying this test to Hill's claim, the Court first noted that the state had a substantial interest in protecting its citizens from the alleged outrageous conduct. *Id.* at 302, 97 S.Ct. at 1064. The Court recognized that, because the abusive conduct was intertwined with allegations of hiring hall discrimination, there was some potential that Hill's state claim would touch on areas generally within the exclusive jurisdiction

---

7. Jackson has also urged in support of his position the Fifth Circuit disposition in *Smith v. Atlas Off-Shore Boat Serv., Inc.,* 653 F.2d 1057 (5th Cir.1981). In *Atlas,* the plaintiff alleged that he was discharged as a seaman in retaliation for filing a personal injury claim pursuant to the Jones Act, 46 U.S.C. § 688, against his employer. The Fifth Circuit recognized Smith's action for retaliatory discharge as a "maritime tort." *Id.* at 1063.

*Smith* is distinguishable from Jackson's case in several respects, the two most pertinent of which are that Smith was an at-will employee and, absent recognition of the maritime tort, had no forum whatsoever in which to press his grievance and that the preemptive effect of the RLA was not at issue in *Smith.*

of the National Labor Relations Board (NLRB). This potential interference did not overcome the state's interest, however, because resolution of the state tort suit turned on whether the union's actions had caused Hill severe emotional distress whereas the focus of an unfair labor practice inquiry would have been on whether the union's conduct discriminated against Hill in terms of employment opportunities. As a result, the tort action could be resolved "without reference to any accommodation of the special interests of unions and members in the hiring hall context." *Id.* at 305, 97 S.Ct. at 1066.

Similarly, in *Sears,* the Court held that Sears could rely on state trespass laws in seeking an injunction against union picketing on its private property. As in *Farmer,* the primary focus of the *Sears* Court was on whether recognition of the state trespass law would interfere with the federal regulatory scheme. The Court stated:

> The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in *Garner*) or different from (as in *Farmer*) that which could have been, but was not, presented to the Labor Board.

*Id.* 436 U.S. at 197, 98 S.Ct. at 1757. Applying this test to the facts presented in *Sears,* the Court found that the focus of the state trespass proceeding would be on *where* the picketing occurred—private property— whereas the focus of an unfair labor practice proceeding would have been on the

objective of the picketing. *Id.* at 198, 98 S.Ct. at 1758.[8]

*Sears* and *Farmer* both raised questions of preemption under the National Labor Relations Act, 29 U.S.C. §§ 151–166 (NLRA), rather than under the RLA. Although this does not mean that the test articulated in *Farmer* and refined in *Sears* is inapplicable to the preemption issue in the present case, the difference between the impact of the NLRA and the RLA has significance. The focus of the NLRA is on specific conduct that Congress has deemed subject to either prohibition or protection, 29 U.S.C. §§ 157–158. Often, as illustrated by *Sears,* it is the objective of certain conduct, rather than the mere exercise thereof, that is relevant to determining whether actions are protected or prohibited by the NLRA. In contrast, the RLA has made *any* grievance arising out of the collective bargaining agreement subject to the exclusive arbitral remedies contained in that Act, 45 U.S.C. § 153 First (i). It follows from this difference that a state claim is more likely to impinge on an area of exclusive administrative jurisdiction under the RLA than under the NLRA.[9]

The lower court cases that have applied the *Farmer* test in the RLA context illustrate this result. For instance, in *Magnuson v. Burlington Northern, Inc.,* 576 F.2d 1367 (9th Cir.1978), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323, the plaintiff sued the defendant railroad and officers thereof in state court, alleging intentional infliction of emotional distress. The gravamen of Magnuson's complaint was that his discharge, following a head-on collision between two freight trains, was part of a

---

**8.** The *Sears* Court also found relevant that Sears could not, on its own initiative, obtain an NLRB ruling regarding the picketing. The issue could be put before the NLRB only if the *union* alleged that Sears was violating its protected rights. 436 U.S. at 201, 98 S.Ct. at 1759. State court was the only tribunal to which Sears could turn to obtain an orderly resolution of the dispute. *Id.* at 202, 98 S.Ct. at 1760.

**9.** In a case decided before *Farmer* and *Sears, Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc.,* 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963), the Court held that

neither the RLA nor any other federal statute precluded a claim, pursuant to the Colorado Anti-Discrimination Act of 1957, alleging that Continental refused to hire a job applicant solely because of his race. The Court found that no provision of the RLA addressed racial discrimination in hiring. 372 U.S. at 724, 83 S.Ct. at 1027. The *Colorado Anti-Discrimination* case illustrates a mode of analysis consistent with *Farmer* and *Sears* and demonstrates that not every state dispute involving a carrier subject to the RLA is preempted by that statute.

conspiracy to cover up the railroad's own negligence which was responsible for the accident. After removal to the federal court, the district judge dismissed Magnuson's complaint on the ground that it was subject to the exclusive jurisdiction of the dispute resolution processes established by the RLA. *Id.* at 1368.

The Ninth Circuit affirmed the dismissal. In distinguishing *Farmer,* upon which Magnuson relied, the majority stated: "Unlike *Farmer,* this action is based on a matrix of facts which are inextricably intertwined with the collective bargaining agreement and the R.L.A." *Id.* at 1369. The court noted that both the wrongful discharge aspects of Magnuson's claim and those pertaining to the propriety of the investigation and hearing had a " 'not obviously insubstantial relationship to the labor contract." *Id.* at 1369–70.

Similarly, in *Majors v. U.S. Air, Inc.,* 525 F.Supp. 853 (D.Md.1981), the district court distinguished *Farmer* in concluding that jurisdiction over Majors' state claims for defamation and false imprisonment was precluded by the RLA. Majors' claims arose from an investigation conducted by the airline into whether he had stolen airline property. The district judge found that because his claim was based on some incident of the employment relationship, it was subject to the RLA. *Id.* at 857; *see also Carson v. Southern Railway,* 494 F.Supp. 1104, 1112 (D.S.C.1979) (state defamation claim is "in essence and substance" an employment grievance solely within the jurisdiction of the NRAB); *Pandil v. Illinois Central Gulf Railroad,* 312 N.W.2d 139, 143 (Iowa App.1981) (facts relevant to plaintiff's claim of wrongful denial of recall from furlough status "inextricably intertwined with the grievance procedures of the collective bargaining agreement" and therefore preempted by the RLA).

■ In applying *Farmer* to the instant case, we must examine "the state interest in regulating the conduct in question and the potential for interference with the federal regulatory scheme." 430 U.S. at 297, 97 S.Ct. at 1061. First, we note that the district court found that Indiana recognized a tort action for retaliatory discharge in *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973).[10] The plaintiff in *Frampton* had been a terminable-at-will employee. She filed a claim pursuant to the Indiana Workmens' Compensation Act of 1929, Ind.Code §§ 22–3–2–1—22–3–6–3, when she learned of a thirty percent loss of use in her arm as the result of a work-related injury. She received a settlement for her injury. Approximately one month later, she was discharged without any reason being given. The Indiana Supreme Court upheld *Frampton's* cause of action, stating: "[W]hen an employee is discharged solely for exercising a statutorily conferred right an exception to the general rule [that, under ordinary circumstances, an employee-at-will may be discharged without cause] must be recognized." 297 N.E.2d at 428.

■ It is significant that *Frampton* was a terminable-at-will employee whereas Jackson was not. Although no Indiana court has addressed whether an employee subject to a union collective bargaining agreement can sue for retaliatory discharge, other courts have limited the action to employees-at-will, reasoning that the retaliatory discharge action provides the *only* means for such an employee to seek redress. *E.g., Cook v. Caterpillar Tractor Co.,* 85 Ill.App.3d 402, 40 Ill.Dec. 864, 407 N.E.2d 95 (1980). *Contra, Wyatt v. Jewel Companies, Inc.,* 108 Ill.App.3d 840, 64 Ill.Dec. 388, 439 N.E.2d 1053 (1982) (refusing to follow *Cook* ).

Conrail has waived any challenge to Jackson's claim on the ground that it fails to state a cause of action. We need not re-

---

**10.** The parties have not contested on appeal the applicability of Indiana law to Jackson's retaliatory discharge claim although portions of the record indicate some ambiguity as to whether Illinois or Indiana law was the basis of the claim. The difference is of little relevance, for our purposes, because it is unclear whether Jackson's claim would be cognizable under the law of either state. *See infra.*

solve, therefore, whether the Indiana court would extend *Frampton* to provide Jackson, an employee who could seek relief pursuant to the collective bargaining agreement, a cause of action for retaliatory discharge. Recognizing that this issue is not clearly resolved is, however, a point of law that this court must consider in determining the state's interest in providing Jackson a judicial forum for his claim.

The second inquiry mandated by *Farmer* is the potential interference with the federal regulatory scheme. It is established under *Andrews* that a claim of wrongful discharge is subject exclusively to the administrative remedies established by the RLA. 406 U.S. at 325, 92 S.Ct. at 1565. Conrail defended against Jackson's retaliatory discharge claim by urging that he was discharged for cause: the violation of Railroad Safety Rules. The inquiry mandated by these two varying explanations of Jackson's dismissal must focus to a significant extent on the validity of Conrail's defense. As such, it is precisely the sort of inquiry required in any wrongful discharge action. Because Jackson's claim could not be resolved by examining only his FELA rights, it is abundantly clear that resolution of his suit impinges on those areas left, under the RLA, to exclusive administrative resolution. The claim raised by Jackson, pursuant to Indiana law, is identical to the claim he would have made, had he pursued the grievance through administrative channels, and therefore the potential interference with the federal regulatory interest is too great, under *Sears*, 436 U.S. at 197, 98 S.Ct. at 1757, to permit an exception to the preemption doctrine.

**B.** *Impact of the Preemption on the District Court's Subject Matter Jurisdiction*

■ Having determined that Jackson's claim is within the scope of *Andrews* and that his state tort remedy is accordingly preempted by the RLA, we turn to whether the effect of preemption in this case is to divest the district court of subject matter jurisdiction over Jackson's pendent claim.

In *Farmer,* the Supreme Court clarified, in the NLRA context, the relationship between preemption and jurisdiction:

"[I]n referring to decisions holding state laws pre-empted by the NLRA, care must be taken to distinguish pre-emption based on federal protection of the conduct in question ... from that based predominantly on the primary jurisdiction of the National Labor Relations Board ..., although the two are often not easily separable." *Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383 n. 19 [89 S.Ct. 1109, 1118 n. 19, 22 L.Ed.2d 344] (1969). The branch of the pre-emption doctrine most applicable to the instant case concerns the primary jurisdiction of the National Labor Relations Board.

430 U.S. at 295 n. 5, 97 S.Ct. at 1060 n. 5. The distinction made by the *Farmer* Court, considered together with the emphasis in *Andrews* on the *exclusivity* of the remedy provided, under the RLA, by the administrative procedures, compels the conclusion that the preemption at issue in this case relates to the subject matter jurisdiction of the court below. Numerous courts concur in this conclusion. For instance, in *Hendley v. Central of Georgia Railroad,* 609 F.2d 1146, 1150 (5th Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981), the court observed that the NRAB has "exclusive jurisdiction over this dispute, unless 45 U.S.C. § 60 is found to override the statutory arbitration processes." In *de la Rosa Sanchez v. Eastern Airlines, Inc.,* 574 F.2d 29, 32 (1st Cir.1978), the court stated: "No federal or state court has jurisdiction over the merits of any employment dispute subject to determination by a system board of adjustment." The Maryland district court has similarly observed that "this Court's jurisdiction is still preempted because of the threat of interference with a federal regulatory scheme." *Majors v. U.S. Air, Inc.,* 525 F.Supp. 853, 856 (D.Md.1981); *see also Carson v. Southern Railway,* 494 F.Supp. 1104, 1112 (D.S.C.1979) (dismissal for lack of subject matter jurisdiction).

Consistent with the foregoing authorities, we hold that the court below lacked subject

matter jurisdiction to entertain Jackson's pendent claim.

## C. Estoppel Regarding Lack of Subject Matter Jurisdiction

The question remains whether Conrail is estopped, by its previous consent to the exercise of jurisdiction by the district court over Jackson's pendent claim, from raising the preemption of subject matter jurisdiction for the first time in its post-trial motions and, now, on appeal.

■ The general rule is that subject matter jurisdiction may be challenged by a party or raised *sua sponte* by the court at any point in the proceedings. *E.g., American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 16–19, 71 S.Ct. 534, 541–42, 95 L.Ed. 702 (1951); *Sadat v. Mertes,* 615 F.2d 1176, 1188 (7th Cir.1980); Fed.R.Civ.P. 12(h)(3). The corollary to this rule is that "subject jurisdiction otherwise lacking cannot be conferred by consent, collusion, laches, waiver, or estoppel." *Sadat v. Mertes,* 615 F.2d 1176, 1188 (7th Cir.1980).

■ Two of the cases upon which Jackson relies are inapposite because the courts determined that they *did* have subject matter jurisdiction over the claim. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *United States v. Edwards,* 23 F.2d 477 (8th Cir. 1927).

The final case relied upon by Jackson in support of his claim that Conrail is estopped from raising the issue of subject matter jurisdiction is *DiFrischia v. New York Central Railroad,* 279 F.2d 141 (3d Cir.1960). In *DiFrischia,* the Third Circuit held that the defendant railroad was estopped from urging, twenty-three months after inception of the case, that diversity of citizenship between the parties, and therefore subject matter jurisdiction, was lacking.

Although the *DiFrischia* court does not elaborate at length as to the legal basis for its recognition of an exception to the general rule that the doctrine of estoppel is inapplicable to the issue of subject matter jurisdiction, the Third Circuit's reference to

*Young v. Handwork,* 179 F.2d 70 (7th Cir. 1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 805, 94 L.Ed. 1363 (1950), suggests that the court viewed the determination of a party's citizenship as a question of fact and therefore distinct from the legal question whether subject matter jurisdiction was demonstrated. Estoppel was therefore applicable because it went to a question of fact rather than to the determination of jurisdiction. *See Young,* 179 F.2d at 73 (" 'place of residence is a question of fact and not a question of law, and that question of fact has been settled in this court' " (quoting district judge in *Young* )).

*DiFrischia* is not persuasive support for Jackson's contention that Conrail is estopped from raising the preemptive effect of the RLA. The issue in *DiFrischia* involved diversity of citizenship, not preemption by federal law. Insofar as the rationale of *DiFrischia* turns on the distinction between the factual question of citizenship and the legal determination regarding jurisdiction, *DiFrischia* is clearly inapplicable to this case.

Further, this court has previously held, in a case involving diversity of citizenship, that it would not extend *DiFrischia* beyond its specific facts. *Sadat v. Mertes,* 615 F.2d 1176, 1188 (7th Cir.1980). In so holding, the *Sadat* court was in accord with the weight of authority. *See* C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3522, at 50–52 & 52 n. 25 (1975) (noting that the significance of *DiFrischia* as general precedent is "dubious," *id.* at 50, and that in more recent cases, the Third Circuit has either distinguished or ignored *DiFrischia, id.* at 52). Even if *DiFrischia* remains viable precedent, to apply that case's rule in the present situation, in which diversity jurisdiction is not at issue, would extend it far beyond its specific facts. Consistent with our conclusion in *Sadat,* 615 F.2d at 1188, we decline to do so.

While we in no way condone the failure of Conrail to raise earlier the dispositive question of whether subject matter jurisdiction over Jackson's pendent claim of retaliatory discharge is preempted by the RLA,

this case is governed by the general rule that the question of jurisdiction may be raised at any point in the proceedings. *Id.* For that reason, Conrail is not estopped from raising the jurisdictional issue for the first time in its post-trial motions before the district court.

## III. REMAINING ISSUES RAISED BY THE PARTIES

■ In light of our conclusion that the district court lacked subject matter jurisdiction over Jackson's retaliatory discharge claim, that claim must be dismissed and the judgment of compensatory damages awarded pursuant to that claim vacated. Our resolution of the jurisdictional question necessarily precludes Jackson's assertion on cross-appeal that the punitive damage award pursuant to the retaliatory discharge claim should be reinstated.

The only remaining issue therefore is whether the compensatory damage award of $13,500 pursuant to Jackson's FELA claim must be vacated and a new trial on damages granted. Conrail claims that the award was "tainted" by counsel's argument and evidence appropriate, if at all, only to the question of punitive damages.

The evidence and argument of which Conrail complains pertains to Conrail's net worth, the number of persons in Jackson's family, impliedly dependent upon him for support, and counsel's characterization of the case as an opportunity for the jury to send a message in favor of all working men to corporations throughout the country.

Conrail's argument is untenable because we find no indication that the FELA compensatory damage award was tainted. It is

significant that the damages awarded Jackson on the FELA claim, $13,500 after a ten percent reduction for Jackson's contributory negligence, is less than eight percent of the compensatory damages awarded on the retaliatory discharge claim. Even more striking, it is just over *one percent* of the punitive damages awarded Jackson on the retaliatory discharge claim. These comparisons compel the conclusion that the jury properly considered the FELA claim wholly separate and apart from the retaliatory discharge claim for the purpose of setting a damage figure and therefore no tainting occurred.

If any error did occur below pertaining to the admission of evidence or the tolerance of impermissible argument, a question that we do not decide, the error was harmless. The compensatory damage award of $13,500 in favor of Jackson on his FELA claim will not be disturbed on appeal.

## CONCLUSION

A federal interest embodied in the policies, but not the specific statutory provisions, of the FELA is insufficient to rebut the persuasive preemption of the RLA over Jackson's retaliatory discharge claim. Similarly, *Farmer v. Brotherhood of Carpenters, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), does not support recognition of an "exception" to the preemption doctrine in this case because resolution of Jackson's claim requires consideration of the same issues that Jackson would have raised before an administrative tribunal had he pursued the grievance procedures of the collective bargaining agreement and the RLA.[11]

11. While we respect the prose style and the innovative ability of our brother Posner, in his dissent, we are unable to agree with the underlying premises on which he rests his approach.

We disagree with his conclusion that the case law is in disarray and, therefore, ripe for innovation. The case law, in fact, recognizes two clearly defined exceptions to the pervasive preemption of the RLA. *See* Sections II(A)(1) and (2), *supra.* It is interpretation of the second exception, illustrated by *Farmer v. Brotherhood of Carpenters, Local 24,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), and its progeny,

that is the major point of disagreement between us and Judge Posner. While we construe *Farmer* as precluding district court jurisdiction over an employee's suit if the facts relevant to that suit would also be critical to disposition of an administrative proceeding under the NLRA or RLA, the dissent would abrogate the rule of exclusive jurisdiction and rely instead on the concept of primary jurisdiction. Because, as Judge Posner notes, no case has discussed such an approach, no case has squarely rejected it. At least in spirit, however, it would appear inconsistent with the

The preemptive effect of the RLA is to divest the court below of subject matter jurisdiction and, consistent with the general rule that subject matter jurisdiction may be challenged at any point in the proceedings, Conrail is not estopped from raising that issue for the first time after the jury had returned its verdicts.

The jury award of compensatory damages for Jackson's FELA claim shows no evidence of "tainting" by the admission of improper evidence or argument.

This cause is remanded to the district court with instructions to vacate the judgment and award of compensatory damages in favor of Jackson on his retaliatory discharge claim and to dismiss that claim for lack of subject matter jurisdiction. The judgment in favor of Jackson on the FELA claim is affirmed. Each party shall bear its own costs on appeal. We express no view as to the allocation of costs reached by the judge below relative to the district court proceedings.

REVERSED IN PART; AFFIRMED IN PART.

POSNER, Circuit Judge, concurring in part and dissenting in part.

The plaintiff, Jackson, a railroad worker, was injured on the job and sued the railroad (Conrail) under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq. He later amended his complaint to add a pendent claim that the railroad, in violation of his rights under Indiana tort law, had fired him after and because he filed his FELA suit. He obtained a judgment awarding him damages of $13,500 for violation of the FELA and another $182,000 on his pendent claim, and the railroad has appealed. I agree with my brethren that the FELA damage award must be affirmed and for the reasons they give, but I disagree that the Railway Labor Act deprived the district court of jurisdiction over Jackson's claim for retaliatory discharge.

Ninth Circuit disposition in *Magnuson v. Burlington Northern, Inc.,* 576 F.2d 1367 (9th Cir. 1978), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323.

There is another jurisdictional issue, though, and it requires, I believe, a remand to the district court. A pendent claim must arise from "a common nucleus of operative fact" with the main claim. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Hargrave v. OKI Nursery, Inc.,* 646 F.2d 716, 719 (2d Cir.1980). This formulation is metaphorical rather than functional but can be made functional by considering how best to give effect to both the policy behind pendent jurisdiction and the competing policies that limit its proper scope. The functional approach requires comparison of two harms: the harm to the state's interest in confining adjudication of state law issues to its own courts, if pendent jurisdiction is exercised; and the harm to the holder of a federal claim in having to bring two suits in order to get complete relief in federal court for the wrong done him by the defendant, if pendent jurisdiction is declined. Jackson's FELA claim is based on the facts of the accident. The pendent claim, added by amendment to his complaint more than three years after the accident, is based on the facts of his discharge—distinct facts, which arose long after the accident. Any factual overlap between the two claims is minimal. The judicial economy created by allowing Jackson to maintain his state claim as an adjunct to his federal claim is therefore also minimal, and seems clearly outweighed by the impairment of state autonomy if Jackson is allowed to litigate his state claim in federal court.

There is an alternative route, also with support in *Gibbs,* see 383 U.S. at 725, 86 S.Ct. at 1138, to the same destination. Since Article III of the Constitution does not authorize the federal courts to exercise pendent jurisdiction as such, Jackson's state law claim can be adjudicated in federal court as pendent to his federal claim only if the two claims can be said to constitute a single federal case. There is a sense in which Jackson's claim for retaliatory dis-

In sum, the dissent would create new law, an approach that we find inappropriate in light of the relevant precedent.

charge is an offshoot of his FELA accident case, but they are no more the same case than a father and son are the same person.

Of course, if Jackson were alleging a federal rather than state tort, we could forget pendent jurisdiction. Though one might think that federal law would forbid retaliation against a railroad worker for exercising his rights under the FELA, a federal statute, probably it does not, see *Graf v. Elgin, Joliet & Eastern Ry.*, 697 F.2d 771, 775 (7th Cir.1983), and in any event Jackson has not pleaded a federal tort and he may not plead one for the first time after appeal. There is also as it happens a good deal of doubt whether retaliatory discharge for exercising a *federal* right is tortious under Indiana law; but as my brethren point out, we must assume for purposes of this appeal that it is since the railroad failed to preserve the question for appeal.

But if Jackson and the railroad are citizens of different states, his state claim has an independent jurisdictional basis in 28 U.S.C. § 1332, the diversity statute, since the requirement that there be at least $10,000 in dispute is satisfied. The complaint alleges that Jackson is a citizen of Indiana and that Conrail is "organized as a railroad corporation engaged in interstate commerce" in Illinois. It is unlikely that this is meant to be an allegation that Conrail is incorporated in Illinois; but in any event, since some public utilities and common carriers incorporate in many states, it is possible (though I should think unlikely) that Conrail is a corporate citizen of Indiana, which would defeat diversity. I am sure Conrail does not have its principal place of business in Indiana, which would also defeat diversity. See 28 U.S.C. § 1332(c).

So I would remand the case to determine whether Jackson's state law claim is within the diversity jurisdiction. Not only do my brethren proceed by a different route, holding that the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, bars jurisdiction over Jackson's state law claim, but they do not discuss the question whether the claim is within either the pendent or diversity jurisdiction of the federal courts. Now one might think that it would make no difference why the federal courts lack jurisdiction over Jackson's claim, provided they do, and that the majority's approach is more economical than mine because it avoids the necessity of remanding. But I believe it does make a difference. If a case is not within the jurisdiction conferred on the federal courts by Article III, they have no power to decide whether Congress has withdrawn their jurisdiction over a particular claim; they must dismiss before reaching that issue. To illustrate, suppose I brought a suit in federal court against Conrail complaining about its treatment of Mr. Jackson—brought the suit in my capacity as a public-spirited citizen. Article III would bar the federal court from adjudicating my claim. I would lack the constitutionally required standing; there would be no case within the meaning of Article III. The court could not ignore the issue of standing, proceed to the merits, and dismiss the suit on the ground that the Railway Labor Act barred it. This case is no different.

I also disagree with my brethren's analysis of the effect of the Railway Labor Act on Jackson's claim. They have applied the doctrine of exclusive jurisdiction; they should have applied the doctrine of primary jurisdiction. The Railway Labor Act does give the arbitration panels established under the Act exclusive jurisdiction to decide disputes between railroads and their employees "growing out of grievances or out of the interpretation or application of [collective bargaining] agreements ...." 45 U.S.C. § 153 First (i). This means that if as in *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), a railroad worker complains that he has been fired, or refused reinstatement, in violation of the collective bargaining agreement between his union and the railroad, he must litigate his claim before the arbitration panels set up under the Railway Labor Act; he may not, simply by describing his grievance as wrongful discharge (or intentional infliction of emotional distress, see *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir.1978)), get a state or federal court to determine his rights under

the collective bargaining agreement. But Jackson claims to have been fired for exercising a statutory right, and such a claim is not a grievance founded on the collective bargaining agreement. (Although the statute refers to "grievances" and "interpretation or application of [collective bargaining] agreements" disjunctively, "grievance" means a dispute over the application of a collective bargaining agreement. See, e.g., *Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.,* 353 U.S. 30, 33, 77 S.Ct. 635, 637, 1 L.Ed.2d 622 (1957).)

It is not a grievance because it would exist even if there were no collective bargaining agreement, unlike the situation in *Andrews.* There it was "conceded by all that the only source of petitioner's right not to be discharged, and therefore to treat an alleged discharge as a 'wrongful' one that entitles him to damages, is the collective-bargaining agreement between the employer and the union." 406 U.S. at 324, 92 S.Ct. at 1565. See also *de la Rosa Sanchez v. Eastern Airlines, Inc.,* 574 F.2d 29, 32–33 (1st Cir.1978). The collective bargaining agreement in this case is no more the source of Jackson's cause of action than if he were suing Conrail for a battery committed against him by his supervisor. Although an employee might as in *Graf v. Elgin, Joliet & Eastern Ry., supra,* 697 F.2d at 774–75, complain that retaliatory discharge was a violation of the collective bargaining agreement, he need not in order to have a cause of action; retaliatory discharge, even if not forbidden by the agreement, may—as Jackson claims and we must assume—be tortious under state law. Cf. *id.* at 781–82.

All this is not to say that the collective bargaining agreement is irrelevant to this case. But it is relevant if at all as a defense to rather than as the foundation of Jackson's claim. The railroad argues that it discharged Jackson not because he sued it under the FELA but because he violated work rules and that the collective bargaining agreement entitled it to fire him for such violations. Now if the railroad fired Jackson only because he sued it, it is immaterial that it could validly have fired him on another ground. But if it fired him both in

retaliation and for violating work rules, and each reason would have resulted in his being fired even in the absence of the other, the retaliation did not injure him. He would have been fired anyway, so there was no "but for" causation and hence no tort, which presupposes injury. This assumes, however, that the collective bargaining agreement would have allowed the railroad to fire Jackson for violating work rules; and whether this assumption is correct depends on the interpretation of the agreement—a matter within the exclusive competence of the arbitration panels under the Railway Labor Act.

But it does not follow that because the interpretation of the collective bargaining agreement is outside the district court's jurisdiction, yet may be material to Jackson's tort claim, the district court lacked jurisdiction over that claim. It follows only that upon the railroad's timely request the district court would have been required by the doctrine of primary jurisdiction to stay the proceedings before it while the parties repaired to the arbitrators for a definitive interpretation of the collective bargaining agreement. (On the doctrine generally see *United States v. Western Pac. R.R.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 68, 91 S.Ct. 203, 208, 27 L.Ed.2d 203 (1970).) If the arbitrators decided that the railroad had fired Jackson in violation of the agreement, the district court proceeding could resume. If the arbitrators decided he was fired in full compliance with the agreement (implying not only that the agreement provided valid grounds for discharge but also that the railroad would have fired Jackson on those grounds even if he had never sued it), then he could not prove tort causation and this suit would have to be dismissed.

We noted recently that the doctrine of primary jurisdiction is applicable to proceedings in which an issue arises that is within the exclusive competence of the Railway Labor Act arbitrators, and that the application of the doctrine may—depending

on legislative intent—be waivable by a party's failing to make a timely request for reference to the arbitrators. *In re Chicago, Milwaukee, St. Paul & Pac. R.R.,* 713 F.2d 274, at 282–283 (7th Cir.1983). Neither the language nor the general scheme and background of the Railway Labor Act suggests that Congress would have wanted a court to dismiss a railroad worker's common law suit merely because the interpretation of a collective bargaining agreement might—not that it must—become material, when the railroad did not think enough of the point to ask the trial court to send the parties to the arbitrators. And if reference is waivable, it was waived here by the railroad's failure to ask the district court for such a reference.

Now in *Andrews,* it is true, even if the railroad had not objected to the employee's failure to seek redress before the arbitrators, the court would have had no jurisdiction over his claim. "[T]he notion that the grievance and arbitration procedures provided for minor disputes in the Railway Labor Act are optional, to be availed of as the employee or the carrier chooses was never good history and is no longer good law." 406 U.S. at 322, 92 S.Ct. at 1564. But that is because the Act gives exclusive jurisdiction over disputes arising from a railroad collective bargaining agreement to the arbitrators. The present dispute does not arise from the collective bargaining agreement. It has an independent basis in tort law and is therefore outside the arbitrators' exclusive jurisdiction though aspects of it may be within their primary jurisdiction.

There are questions about the mechanics of primary jurisdiction in a case such as this—who should ask for the reference (if the employee must go to the arbitrators before filing suit, then one would speak of "exhaustion of remedies" rather than of "primary jurisdiction," but these are essentially the same doctrines, see *City of Peoria v. General Electric Cablevision Corp.,* 690 F.2d 116, 121 (7th Cir.1982), except for timing), what deadlines are applicable, whether an arbitration panel would accept a reference and if not who would bear the onus in the judicial proceeding of having failed to get the panel's views. The simplest solution would be to require the employee to process his complaint as a grievance first (i.e., to exhaust), but I am not prepared to say that this is the only permissible solution. My basic point is unaffected. In a case like the present, applying primary jurisdiction, or exhaustion of remedies in the sense of "merely requiring exhaustion of remedies in one forum before resorting to another," rather than of "mak[ing] the federal administrative remedy exclusive," as in *Andrews,* 406 U.S. at 325, 92 S.Ct. at 1565, would protect the arbitrators' exclusive competence to interpret collective bargaining agreements—their interpretation would not even be reviewable in the tort suit, but only by the distinct and limited procedure specified in the Railway Labor Act, cf. *Port of Boston Marine Terminal Ass'n, supra,* 400 U.S. at 69, 91 S.Ct. at 208; *City of Peoria v. General Electric Cablevision Corp., supra,* 690 F.2d at 122. But it would do so without cutting down rights under state law any more than is necessary to protect that competence.

It puzzles me why we should go further and hold, as my brethren do in effect, that even if the arbitrators decide that the railroad had no contractual right to fire the employee, the employee may not maintain a tort action for retaliatory discharge. It is a grave matter for an employer to fire an employee for exercising a legal right. True, if he does this he may well be violating the collective bargaining agreement and the arbitrators can order the employee reinstated with back pay. But it would be surprising if compulsory arbitration of contract disputes was intended to wipe out the employee's common law rights other than his right to enforce the very contracts that are subject to the scheme of compulsory arbitration. It might be different if Congress had established an administrative agency to police tort or tort-like conduct in railroad employment, but it has not; it has contented itself with requiring arbitration of contract disputes.

But maybe this takes too narrow a view of Congress's objectives in the Railway Labor Act; maybe it can be argued that Congress wanted to exclude the courts, state and federal, from any involvement in the railroad employment relationship beyond the very limited review function that it assigned the federal courts in connection with arbitration awards. There may be something to this argument, but I am sure no one takes it literally. No one would argue that if Jackson's supervisor had punched him in the nose for refusing to obey an order Jackson could have prosecuted a complaint against the railroad only as a grievance before one of the arbitration panels, and not as a complaint in court for common law battery. I do not see why a case where a railroad intimidates (though not physically) workers who file accident claims should be treated differently.

My brethren's review of precedent shows that the case law on the displacement of tort law by the Railway Labor Act is in disarray; the suggestion that there are "clearly defined exceptions to the pervasive preemption of the RLA" is a contradiction in terms—if the preemption were truly pervasive, there would be no exceptions. And their further effort to bring that body of case law into phase with the cases dealing with the displacement of tort law by the National Labor Relations Act, 29 U.S.C. §§ 152 *et seq.*, such as *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), can only be described as heroic. A possible way out of the mire is to recast the problem as one of primary jurisdiction, a doctrine that applied to these cases (I confine my attention to the Railway Labor Act) would enable federal interests to be fully served with minimum damage to state interests. True, it would not eliminate all difficult questions. *Andrews* forbids the states to provide common law remedies for breach of a railroad collective bargaining contract simply by calling the breach a tort, and sometimes it will be hard to decide whether a cause of action is based on the contract or on a right (conferred by state law) that is more than just a right to have a contract honored. Here, however, as in the defama-

tion and false-imprisonment cases that the majority opinion cites, the cause of action clearly has an independent source in state tort law; it is not just a case of breach of contract by another name, as in *Andrews* and (less clearly) *Magnuson.* Although it would be reckless to suggest that primary jurisdiction is the secret key to reconciling all the cases reviewed in the majority opinion—though the majority I notice quotes the Supreme Court's description of *Farmer* as a primary-jurisdiction case, see 430 U.S. at 295 n. 5, 97 S.Ct. at 1060 n. 5—no previous decision of this court, and no decision of the Supreme Court, prevents us from adopting the approach I have suggested. We are free to innovate, in an area where innovation would be fruitful.

To summarize, if the doctrine of pendent jurisdiction were applicable, the district court would in my view have jurisdiction over Jackson's claim of retaliatory discharge despite the Railway Labor Act. But as I said earlier this is not a proper case for pendent jurisdiction and we cannot be certain that Jackson's claim is within the diversity jurisdiction. We should remand, but I earnestly suggest not dismiss, that claim.